## ARNAULD et al. *v.* DELACHAISE.

4    109
Case 2
124    716

Where a proprietor who had divided a part of a tract of land into lots, leaving a space between those nearest the river and the public road, as well as the batture, and the remainder of the tract in the rear beyond the lots, undivided and vacant, sells the lots in conformity with a prospectus which recites that "the portion of the front, of the batture, of the pasture, and of the cypress swamp corresponding with the lots offered for sale, is abandoned in perpetuity in favor of the purchasers, to be by them enjoyed in common, with this sole condition that the said purchasers shall not send in the common pasture but three head of animals for each lot, and shall cut wood in the swamp for their private use only, and not for sale," the interest of the purchasers in the front, batture, pasture and cypress swamp, is not a mere right of use, or usufruct, but the vendor will be considered as having completely divested himself of all right to the property, the term *abandonment* excluding any reservation as to the title as positively as the term *perpetuity* excludes any limitation of time. The conditions as to the use of the pasture land and wood, is intended merely to regulate the use among the purchasers, and does not conflict with, but is in furtherance of, the avowed objects of the sale.

If the terms used would, in a testament or donation, transfer the property, they will have the same effect in a contract of sale.

APPEAL from the District Court of Lafayette, *Clarke*, J.

*Maurian*, for the plaintiffs. The purchasers from *Wiltz* acquired only a usufruct or right of use to the vacant space in front, to the batture, pasture and cypress swamp. They acquired only a right to *enjoy*, and not to *dispose* of it. Code of 1808, p. 100, art. 34; p. 102, art, 1; p. 110 art. 1; p. 124, art. 63. Civil Code, 479, 483, 525, 621. Code Nap. 544, 578, and Rogron's Comm. on those arts. and on art. 625. Lacroix, Clef des Lois Romaines, *verbo* Usage, Rodriguez de Fonseca, vol. 3, p. 416, no. 3; p. 404, proeme Law 1. The right of use or usufruct has been forfeited in this case by: 1, non-user; 2, abuse; 3, by the expiration of the term for which it was granted.

*Lambert* and *Mazureau*, on the same side.

*Le Gardeur*, for the defendant, appellant. 1. It was not a right of use which the defendant acquired under the abandonment in the *Prospectus*.

ARNAULD
*v.*
DELACHAISE.

The right of use, as defined by the Code, is that given to any one to make a gratuitous use of a thing belonging to another, or to exact such a portion of the fruits it produces as is necessary for his personal wants and that of his family. Art. 621. The *dominium* of a thing is composed of three different attributes corresponding to as many partial rights, to wit: the usus or use, the enjoyment or fructus, and the right of disposing or abusus. We also know that the usus, when granted separately from the other attributes, constitutes a right of use, and the fructus or enjoyment, which also includes the usus, what is called in law a right of usufruct. Ducaurroy, (Institutes expliquées, vol. I, no. 438) says: " En comparant l'usufruit et l'usage, on appelle ce dernier nudus usus, pour indiquer l'usage séparé de la jouissance, l'usage sans fruits, nudus usus, id est, sine fructu, de même qu'on appelle nue-propriété celle dont on a séparé la jouissance. Effectivement, l'usager: uti potest, frui non potest, tandis que l'usufruitier a le double droit d'user et de jouir." It is, therefore, plain that the title which expressly grants the enjoyment, that is, the fructus of a thing. constitutes on behalf of the grantee a right of usufruct and not a right of use. Now, by referring to the prospectus, we see that the batture, devanture, savane and cyprière are abandoned in perpetuity to the purchasers, not to be *used*, but to be *enjoyed*, by them in common; and the consequence is that if the ownership did not pass under this abandonment, it created at least a right of usufruct, but most certainly not a right of use.

2. The abandonment in the prospectus did not create a right of usufruct.

A usufruct is a personal servitude which attaches to the person for whose benefit it is established and terminates with his life. La. Code, art. 642. " Les servitudes personnelles," says Mackeldey, (Droit romain, p. 153, § 278,) " ont toutes ce caractère commun, qu'elles sont des droits essentiellement personnels, que par là elles ne peuvent être séparées de la personne qui y a droit, et s'eteignent par sa mort, si elles n'ont été expressément concédées pour elle et pour ses héritiers. Le droit romain range parmi les servitudes *personnelles,* l'usufruit, l'usage et l'habitation." Proudhon (Droits d'Usufruit, vol. 1, p. 4, no. 9, 2d paragraph) lays down the rule that: " L'usufruit est, pour l'usufruitier, un droit purement personnel, parce qu'il consiste dans la faculté de jouir; faculté essentiellement corrélative à la personne qui en use; et de là il résulte (no. 12) que, quoique, en thèse générale, on soit censé stipuler tant pour ses héritiers que pour soi-même, néanmoins, lorsqu'il s'agit d'un droit d'usufruit établi par acte entre-vifs, il n'est toujours acquis qu'au profit de celui pour lequel il a été nominativement stipulé, et ne peut s'étendre à ses successeurs sans une stipulation expresse à cet égard." Voet (ad Pandectas, vol. 1, p. 600, no. 2) says: " Personales servitutes præcipué tres sunt, ususfructus, usus et habitatio. Quamvis enim haud videatur eundum inficias, quin eæ quæ naturâ suâ reales sunt, ex voluntate constituentium in personales degenerare queant, tamen cùm hæ tres ita personales sint, ut ne ex conventione quidem specificâ fieri reales possint, usufructu et usu personam desiderante, cujus ossibus inhæreat, et naturâ habitationis vel justa sensum communem regugnante, quó minus prœdio constituatur, meritó etiam solæ personalium nomen per excellentiam sortitœ sunt." Ortolan, in his Institutes explained, vol. 1, p. 430, says: " Nous passons aux servitudes personnelles, dans lesquelles le droit détaché de la propriété n'est point détaché pour augmenter l'agrément ou l'utilité d'un fonds; mais pour l'avantage spécial d'une personne à laquelle il appartient." Dalloz (Vo. Servitudes, no. 6) says: " La servitude ne peut exister que sur un fonds et en faveur d'un fonds, et ne peut être imposée ni à une personne ni en faveur d'une personne; c'est le caractère qui le distingue essentiellement, des droits d'usufruit et d'usage, lesquels sont independans, pour celui qui les exerce, de la possession ou propriété d'un fonds."

From these laws and authorities it follows, as a necessary consequence, that a grant does not, nay cannot, create a usufruct, unless it be made to a person by name, on account of that person alone, and without any regard to the grantee being or not in possession of a particular estate. Let us apply this rule to the abandonment by *Joseph Wiltz.* He says, in the prospectus, that the batture, devanture, &c., are abandoned in perpetuity to the purchasers of the forty-two lots offered for sale. It is plain, therefore, that the abandonment is made *to no person by name*; that it does not contemplate the personal advantage of the transferees, without regard to their being or not in possession of any estate; but, on the contrary, refers exclusively to such persons only, whoever they may be, that may happen to acquire a particular piece of property.

ARNAULD
*v.*
D'ELACHAISE.

In other words, the right granted by the abandonment attached to the property to be sold without any reference to the particular person that might purchase it; the object being clearly to enhance the value of the property, by the advantages attached to it. Therefore, under the rule as deduced not only from the authorities above quoted, but also from our own laws, the abandonment being made to no person by name, nor on the exclusive account of any person, but, on the contrary, for the benefit of the property itself, did not, nay could not create a right of usufruct.

But I am willing to admit, for argument sake, that instead of abandoning the things themselves, to wit: the batture, devanture, &c., as he expressly did, *Wiltz* had abandoned only, but in perpetuity, the usufruct of those things. What would the consequence be? Unquestionably, that the abandonment being made in perpetuity and the naked property being in express terms given to none, nor reserved for the benefit of the vendor, the ownership itself passed to the purchasers. The authorities are positive to that effect. *Proudhon,* (vol. 1, p. 4, no. 8,) lays down the rule that perpetuity is contrary to the very essence of usufructs, and from that rule, draws the following consequences, viz: " Si la jouissance intégrale d'un fonds avait été expressément léguée à perpétuité au profit d'une commune, le droit légué n'aurait d'usufruit que le nom, et ce serait véritablement la propriété qui aurait été léguée." Dalloz (verbo Usufruit, no. 1,) fully concurs in the opinion of Proudhon on this question. Roland de Vilargues also concurs in the opinion of Proudhon. He says (Vo. Usufruit, no. 8): " Remarquez que l'usufruit ne peut être que temporaire; car s'il pouvait être perpétuel dans sa durée, le droit de propriété ne serait plus rien. Aussi lorsqu'il est établi au profit d'un établissement public destiné à durer toujours, la loi, dans le silence de l'homme, lui assigne elle-même un terme. D'où l'on doit conclure que si un usufruit avait été légué à perpétuité au profit d'une commune, ce serait véritablement la propriété qui aurait été donnée." Favard de Langlade (Vo. Usufruit, § 4, no. 1,) says: " Si l'usufruit ne s'éteignait point, le droit du propriétaire serait complètement illusoire, et l'utile, la véritable propriété serait dans les mains de l'usufruitier. Aussi la Cour de Cassation n'a-t-elle point hésité à reconnaître un droit réel de propriété dans un usufruit perpétuel."

The decision referred to by Favard de Langlade was rendered by the Court of Cassation on the 29th June, 1813, in the case of *Varré* v. *D'Avranche D'Hangeranville.* Merlin, upon whose conclusions it was rendered, makes the following remarks, viz:

" Par l'acte, *Guillaume de Montmorency* (the original grantor) cède et transporte aux preneurs, moyennant deux rentes foncières, annuelles et perpétuelles, en grains et en quotité de fruits, non pas la simple jouissance, non pas l'usufruit, mais le corps même, et par conséquent la propriété de deux pièces de terre, l'une de trois cents arpents, formant le gros du fief des Edrolles; l'autre, de deux cents arpents, formant le gros du fief de Lys. Il déclare même littéralement céder le fonds propre et domaine de ces deux fiefs; il oblige de l'un et de l'autre à lui en payer les redevances convenues, à peine de confiscation et de rentrée en icelles terres, confiscation et rentrée qui supposent certainement une expropriation actuelle; enfin, il se réserve sur ces memes terres toute justice, travers, chasse et seigneurie.

" Si ce n'est pas la un acte translatif de propriété, nous le disons hautement, il faut renoncer à l'esperance de trouver nulle part un acte de cette nature; il faut refuser aux termes qui y sont employés le sens qu'on leur a attaché dans tous les temps; il faut nier qu'il fait jour en plein midi."

In the act by which *Guillaume de Montmorency* ceded the five hundred arpents of land, he subjected the transferees to the payment of an annual and perpetual rent under penalty of forfeiture, and expressly reserved to himself the right of seigneurie. In the transfer by *Joseph Wiltz,* he abandoned in perpetuity the batture, devanture, savane and cyprière, but subjected the transferees to no obligation towards him and made no reservation whatever for his benefit. The case before the Court of Cassation was, then, much stronger than that now under consideration, and yet that court, concurring in the opinion of Merlin, disagreed with the appellate Court of Amiens which had decided that the usufruct only of the five hundred arpents had been granted by *Montmorency,* and decreed that the ownership itself had been conceded, and that the obligation of paying the rents was extinguished by prescription, and the transferees dispensed from complying with that obligation.

ARNAULD
v.
DELACHAISE.

3. It was the ownership itself that passed to the defendant under the abandonment in the prospectus.

The language of the prospectus is clear. But admitting for argument's sake, that the language and intention of *Wiltz* were not as clear as I conceive them to be, then we must endeavor to ascertain them by the ordinary rules of construction.

Proudhon (Droit d'Usufruit, vol. 1, no. 497,) lays down the rule that when a grant is expressly intended to be perpetual, it does not create a mere right of usufruct, but conveys the ownership of the thing itself. He says: " De quelque locution que le testateur se soit servi, l'impropriété des termes doit fléchir devant l'expression de sa volonté sur les effets qu'il a entendu attacher à sa disposition : or l'usufruit étant essentiellement temporaire, si donc le donateur a voulu au contraire que l'objet de sa libéralité fut perpétuel, et qu'il l'ait clairement exprimé, il est nécessaire d'en conclure que ce n'est pas un droit d'usufruit qu'il a légué. C'est le droit de propriété qui aura été légué sous une fausse denomination quelconque, si la jouissance du legataire doit s'etendre à tous les produits et emolumens du fonds, parce qu'ayant toute l'utilité du domaine, et l'ayant a perpetuité, il sera necessairement proprietaire." Now, in this case, the grant is intended to be perpetual and all the " produits et émolumens" of the thing, so far as the grantor is concerned, are conveyed to the grantees. The consequence, therefore, is that the ownership itself was granted.

The same author (vol. 1, nos. 499 and 500,) holds that the usufruct is conveyed, only when the separation of the right of enjoyment from the right of ownership is clearly expressed in the act; and he comments upon that rule in the following manner, to wit : " Cette règle est fondée sur ce que, sous quelque dénomination qu'une chose soit comprise dans un legs ou une donation, le domaine entire est censé aliéné s'il ne parait pas évident que c'est seulement l'usufruit qui en été détaché, ou que c'est seulement la vue propriété qu'on a voulu aliéner en se réservant l'usufruit ; attendu qu'il est contraire à l'ordre naturel des choses que le propriétaire n'ait pas le droit de jouir de ce qui lui appartient, et qu'en conséquence il faut que la dérogation à cet ordre résulte formellement de l'acte de donation. C'est par suite de ce principe que les auteurs qui ont écrit sur cette manière, enseignent, d'après le texte des lois romaines : Que le legs d'une maison pour l'habiter, celui d'un fonds pour en jouir, celui d'un domaine pour que le légataire ait de quoi vivre, comprend aussi la propriété entiere de la maison, du fonds, ou du domaine, parce qu'autre chose est d'exprimer ainsi le motif ou la cause de la disposition, autre chose est de ne léguer qu'un simple droit de jouissance : Illam autem adjectionem, ut habeant unde pascant, magis ad causam prælegandi, quàm ad usumfructum constituendum pertinere."

In this case, the batture, devanture, savane and cypriére are included in the grant, and it is far from being evident that the usufruct thereof was alone intended to be conveyed. Besides, as in the case cited by Proudhon, they are abandoned in perpetuity to the purchasers, pour en jouir. The conclusion, therefore, cannot be resisted that the ownership, and not the usufruct, was conveyed by the abandonment in the prospectus.

The case of *Pontalba* v. *The City of New Orleans*, 3 An., 660, is decisive of this.

But should it be held that there is no analogy between the two cases, I contend, upon the authority of Merlin, that the grant in this case is not even a grant *sub modo.* Merlin (Vo. Mode, no. 1,) says : " On confond quelquefois le mode avec la condition ; il y a même des textes du droit romain qui donnent à l'un le nom de l'autre. Il y a cependant une différence entre le mode et la condition, et elle consiste tant dans la manière de les exprimer que dans les effets qui en résultent respectivement. La loi 80, D. de conditionibus et demonstrationibus, nous apprend en quoi la formule caractéristique de la condition différe de celle qui désigne le mode. Nec enim, dit-elle, parem dicimus cum cui ita datum est, si monumentum fecerit, c'est la condition ; et eum cui datum est ut monumentum faciat, c'est le mode. On voit par là que la particule si forme la condition, et que les mots pour, afin que, à la charge, caractérisent le mode. Mais, pour que ces mots forment une disposition vraiment modale, il faut qu'ils ne se rapportent pas uniquement à l'intérêt du donataire ou légataire. Ainsi dans le legs fait à quelqu'un pour étudier, pour se mettre en métier, ou pour l'aider à se marier, il n'y a point de mode, mais seulement une cause impulsive, dont le défaut d'accomplissement n'empêche pas le légataire de recueillir la

libéralité du testateur, à moins que celui-ci n'ait manifesté une intention contraire, La loi 71, D. de conditionibus et demonstrationibus, porte que, 's'il a été légué à Titius cent écus pour s'acheter un fonds de terre. on ne doit pas lui demander caution pour l'exécution de cette clause, parce que elle ne concerne que son intérêt.'" Now, under the distinction drawn by Merlin between a condition and a *modus*, it cannot be contested that the grant in this case would clearly be a grant *sub-modo*, had the disposition been intended for the benefit of the grantor or some other person not party to the act. But as that disposition was unquestionably intended for the sole and exclusive benefit of the grantees, then, as Merlin teaches, there is no *modus*, but a mere "cause impulsive," the non-compliance with which does not, nay, cannot destroy the grant. Under these circumstances then, as the disposition attached to the perpetual abandonment of the devanture, batture, &c., is not a *modus*, but simply an impulsive cause, the failure of which is not fatal to the grantees, the abandonment was intended to be, and therefore is, unconditional and absolute. That this abandonment, uncoupled with any *modus* or condition. does transfer the ownership of the things abandoned, cannot reasonably be denied.

*Roselius*, on the same side. In this examination it is to be borne in mind that the seller is bound to explain himself clearly respecting the extent of his obligations; any obscure or ambiguous clause is construed against him. (C. C. 2449.) This rule is fundamental, and as old as the law itself. Papinian, the prince of roman jurists, lays it down as follows: "Veteribus placet pactionem obscuram vel ambiguam venditori et ei qui locavit nocere, in quarum fuit potestate legem apertius conscribere.". L. 39, De Pactis. See Troplong, De la Vente, vol. I, p. 347, no. 256. Hence it follows that, if the language used by the vendor in the present case be susceptible of different interpretations, that most favorable to the purchasers must be adopted.

In the prospectus it is stated, in the most explicit terms that the land in question, "is forever abandoned by the vendor in favor of the purchasers of the forty-two lots, to be enjoyed in common by them, with this sole condition, that the said purchasers shall send upon the pasture land in common not more than three head of cattle for each lot, and they shall cut and make wood in the cypress swamp for their own individal use, and not for the purpose of trade."

It is too clear to admit of serious controversy, that the expression "abandoned forever," as used in the prospectus as well as in the deeds of sale is synonimous to transfer or convey. They are words clearly indicative of an intention to alienate the thing itself; and utterly inconsistent with the idea of the grant of the mere usufruct or use of it. The well known axiom is, "nulli enim res sua servit jure servitutis." Dig. b. 8, 1, 2.

But it is urged that the meaning of the words which we are considering are modified, or rather entirely changed, by the succeeding branch of the same sentence, which is as follows: "to be enjoyed in common by them." It is said that these expressions clearly show that the enjoyment only, and not the thing itself, was intended to be conveyed. With what color of reason can it be pretended, for a single moment, that this useless direction given by the vendor to the purchasers, can destroy the absolute and perpetual abandonment of the property which he had just made? I say useless, for no one will deny that if these words had been omitted, the enjoyment in common would have been a necessary consequence from the fact that the abandonment had been made to them in common. Could there be any other enjoyment except in common by the proprietors, until a partition had taken place? It appears, therefore, quite plain, that the clause in the prospectus "to be enjoyed in common by them," can neither control nor modify the preceding clause translative of the title of the property. Thus it is manifest that so far at least as the devanture and batture are concerned, there is no foundation whatever, even for a plausible argument in support of the interpretation which the learned counsel for the plaintiffs endeavor to give to the prospectus and deeds of sale emanating from *Wiltz.*

This brings us to the question, what is the legal operation of the concluding clause of the prospectus? It is clear that these directions in relation to the common enjoyment of the common property, were inserted in favor of, and for the benefit of the purchasers; and it is equally clear that this is a matter in which the heirs of the vendor have no interest whatever.

In what manner has this contract been executed by the parties themselves? How did they interpret it at the time of its date, and for upwards of forty

Arnauld
v.
Delachaise.

years afterwards? There is not the slightest evidence that either *Wiltz* him-self, or his heirs had set up any claim to this property until this suit was insti-tuted. On the contrary, in 1824, one of his heirs, *Mrs. Arnauld.* in the sale to *Pierre Foucher*, expressly recognized the alienation which her father had made of this property. One of the safest rules of interpretation of a contract is the manner in which it has been executed by the parties themselves.

Lastly, what was the object which *Joseph Wiltz* had in view in abandoning the front and rear of his property in favor of the purchasers of the forty-two lots which he was about to sell? Evidently the enhancement of the price for which he would be able to sell these lots.

The counsel seem to rely with much confidence on the fact that the right of disposing of the property abandoned is not given in express words. The first answer to this argument is that the right of alienation is of the very nature of ownership, and need not be expressly conferred on the purchaser by the ven-dor; and in the second place, that property is sometimes so situated that it can only be alienated together with and as an accessory or appendage to other pro-perty. Such for instance, as a common alley, or the commons belonging to a city, town, village, or hamlet; these things cannot even be divided except by the unanimous consent of all the parties interested. Toullier, Des Servitudes ou Services Foncières, p. 204, no. 469 *bis.* Pandects, b. 10, tit. 3, law 19, § 1. " De vestibulo communi binarum aedium arbiter communi dividundo invito utrolibet dari non debet: quia qui de vestibulo liceri cogitur, necesse habet in-terdùm totarum aedium pretium facere, si aliàs aditum non habet." Which I translate as follows : " The judge cannot order the partition of a common entry or alley to two houses without the consent of both proprietors; because he who is compelled to submit to the adjudication of the common alley to his coproprietor may thereby sustain the loss of his whole house, on the supposi-tion that he cannot obtain another entry into his house." What is the diffe-rence in principle, between the case of a common entry or alley, put by Pau-lus in the text just cited, and that before the court?

The distinction between a servitude and such rights as the purchasers of the forty-two lots acquired to the property in dispute, is established with much force and clearness by Toullier, vol. 3, p. 332, no. 479.

Proudhon, Traité des Droits d'Usufruit, d'Usage, &c., no. 8, lays down the same doctrine. Indeed, there is no diversity of opinion on the subject, for Merlin, (who, it was asserted, contradicted Proudhon,) recognises the same distinction. Merlin, Repertoire, *verbo Communes.*

The next inquiry is, in whose favor was the sole condition established? who was to be benefited by it—the vendor or the purchasers? We contend that the land in front and in the rear was regularly conveyed to the purchasers of the forty-two lots, as an accessary; and was set apart as the commons of the inhabitants of the Quartier de Plaisance. These commons were transferred and dedicated by the founder of the village or hamlet to the perpetual use and benefit of its inhabitants. The *modus* or sole condition as it is termed, was imposed to establish a just and equitable rule by which the common enjoyment was to be regulated. This rule was laid down by the grantor for the benefit and protection of the grantees; and it is equally clear that the rule can be abrogated by the unanimous consent of those in whose favor it was established. No one has any legal interest in this property except the purchasers of the forty-two lots and their heirs or assigns; who then can object to its partition among those to whom it belongs. See Merlin, Rep. verbis Communaux and Communes. Favard de Langlade, verbo Communes. The authority cited by the counsel for the plaintiffs from the 3d vol. of the "Jurisprudence Encyclo-pedic," verbo Communes, p. 77, is to the same effect.

As *Joseph Wiltz* has divested himself of all title to the property, his heirs cannot maintain any action for its recovery; nor have they any interest to con-test the right of the defendants to make a partition of it. *White* v. *City of Cincinnati*, 6 Peters, 431. *Barclay* v. *Harvell's Lessee*, 6 Peters, 498. *City of New Orleans* v. *United States*, 12 Peters, 662. *City of Lafayette* v. *Holland*, 18 La. 286.

*H. A.* and *H. B. Bullard*, on the same side. The only question in this case which the court is called on to decide is, what title or right did the purchasers of the forty-two lots acquire to or in the front lands, the pasture grounds and the cypress swamp, by their contract with *Joseph Wiltz*. On the part of the defendant, it is contended that each became, by purchase, the separate owner

of a lot as designated on the plan, and that, after all the lots had been sold, the purchasers acquired a right to the perpetual use and enjoyment of the other portions of the land as proprietors in common; and that the price they paid was equally the consideration for the separate property and for that portion which they were to hold in common. In other words, that the whole was a sale for a specific price, of the whole tract of four arpents front.

Let it be remarked, *en passant*, that the sole condition set forth in the prospectus, related only to the common use of the pasture ground and the wood land. The front portion or devanture is not alluded to. That condition as it is called, is, in truth, a mere restriction upon the use of the pasture land and the cypress swamp, and was evidently intended to regulate their enjoyment by the purchasers, *inter se*. It is neither asserted, nor intimated, that there has been any violation of that restriction; that any proprietor has sent more than three head of cattle on the pasture, or made a commerce of fire-wood or timber. The violation of that condition is no where declared to involve any forfeiture to the grantors, of any rights acquired by the purchasers; and after *Wiltz* had parted with his whole property by a sale of the lots and the abandonment in perpetuity of the out lands, it is difficult to perceive what right he could have, or his heirs after him, to interfere with the purchasers. It appears then clear, that this was not a condition, properly speaking, upon which the title of the purchasers depended. It was not, in fact, a condition at all; it presents a clear case of *modus*, as distinguished from a condition; that is to say, a modification or restriction of the use or destination of the property, in other words, a sale *sub modo*.

Mackeldey, after stating what a modus is, goes on to say, that "it may exist as well in contracts or acts of beneficence, as in those of an onerous character; but it is to be remarked that, in the first (donations), the donor has a right, in case of non-execution of the mode, either to bring his action to compel performance, or for the restitution of the thing given; while in the second, (i. e. onerous contracts,) his action is limited to demand the execution or performance of the mode; but nothing obliges him who is bound to execute the mode, when he alone has an interest in it." Mackeldey, french translation, p. 102. In support of this doctrine, the author cites several authorities from the digest, to which I refer the court. Fr. 41, pr. D. 18, 1; Fr. 17, § 2, pr. 44 D. 40, 4; Fr. 13. § 2, D. 24, 1. See *Pontalba* v. *New Orleans*, in which the court recognizes this distinction. To apply this doctrine to the present case, if the contract between the parties was an onerous one, as appears quite clear, then the only action on the part of *Wiltz* or his heirs would be to compel the performance of the condition or *modus*, and not to rescind the contract, but in order to maintain such an action the plaintiff must show an interest in himself. Now, after all the lots had been disposed of, the purchasers alone had any interest in the manner in which the property should be used and enjoyed. *Wiltz* had no sort of interest in the matter. The purchasers for whose exclusive benefit that restriction was inserted, might dispense with or modify it to suit their own convenience. It never could injure *Wiltz* or his heirs, who even in the case of noncompliance with the condition, could at most compel a specific performance, while they had any interest in doing so, but in no event could claim restitution of the property.

It is not, however, under the pretence that this sole condition has been violated, that the plaintiffs hope to recover. They have not set up in their petition any specific ground upon which they base their pretensions, but merely seek to avail themselves of the original title of their ancestor, as if he had either never been divested of title, or had been so only for a limited period, which has expired, and that they have the right to resume the property.

In argument it is distinctly avowed as the ground on which they expect to recover back the property, that the contract between *Wiltz* and the purchasers of the forty-two lots, gave to the latter only a right of usufruct in the out lands, and that, in consequence of an abuse of the use thus conferred, the grantors have a right to re-enter into possession as proprietors. The question thus presented, is one simply of interpretation of the contract between the parties. Was that contract one of sale of the whole tract, of the building lots as separate property of the purchasers respectively, and of the *devanture, batture, savane* and *cyprière*, as common and undivided property? Or was it a sale only as it relates to the separate building lots, and the establishment of a limited use and enjoyment of the remainder? On our part, we contend, that it was a

sale of the whole, and the court has only to choose between the two hypotheses.

Let us again look at the the terms of the contract; for the intention of the parties is to be sought in the whole context of the act. In the prospectus it is said that the proprietor offers for sale the forty-two lots, and "abandons in perpetuity, in favor of the purchasers, to be enjoyed by them in common, the portion of devanture, batture, pasture ground, and cyprière, corresponding to the forty-two lots, and conformably to the title of the vendor. The acts of sale state a price paid for each lot, and for the perpetual use in common, of the out lands. The price applies as well to the out lands, as to the lots. The words of conveyance apply to both. In one of the acts, the two are coupled together as above stated: "Ensemble tous les droits de savane, batture et cyprière attachés à ces mêmes terrains, conformément au prospectus," &c. These rights are treated as appurtenances of the lots [attachés.] It cannot be supposed that any of the purchasers would have bought, at least for the same price, a single lot, without an interest in the out lands which were abandoned to the purchasers, to be enjoyed in common. The whole contract was entire, and the whole land formed the object of it. If the plaintiffs now recover back the out lands, the purchasers will no longer have what they bought and paid for, but merely each his building lot, without the right attached to it by the contract. The contract of sale requires no sacramental form of words; it is enough if it contains the essentials of consent, price and object. The word abandon is used, but to abandon forever a thing for a price, is essentially as much a sale, as if the contract were clothed in all the verbiage of a spanish notary, and conveyed the property "con todos sus entradas y salidas, usos y servidúmbres." These principles are elementary, and I will not trifle with the court by citing any authorities in support of them.

In the prospectus itself, this portion of land not included in the lots, is treated as "correspondante aux quarante deux terrains." I know of no proper translation of that clause which does not convey the idea—that of appertaining to, or appurtenant to the lots. The word correspond, applied to things, implies that one belongs to the other. Such were the expressions used by the spanish fiscals during the time of the Intendency, when they certified that the tract of land solicited, "corresponde al dominio de S. M." The devanture, the batture, the pasture ground and the cypress swamp, formed a part of the four arpents belonging to Wiltz, and which he disposed of by the various acts of of sale, referring to the prospectus. If the word correspondante has not that meaning, it has none.

It is an obvious and leading rule for the interpretation of contracts or conventions, that we are to seek for the common intent of the parties; and if there be any obscurity in any part of the act, it is to be construed with reference to the nature of the contracts—"secundum naturam negotii." Now, this purports to be a sale, and the whole partakes of the character of a sale. The word sale, may not be used in reference to the out lands, but the expression is that they are abandoned in perpetuity. "In conventionibus, contrahentium voluntatem, potius quam verba, spectari placuit." That the abandonment was in favor of the purchasers of the forty-two lots, is clearly expressed. That the grantor intended to part with his interest in the property forever, is equally manifest. The words in perpetuity, cannot be rejected as surplusage. Whether the contract be regarded as wholly onerous, or as partly gratuitous, (or a donation,) that expression stands in the way of the plaintiffs' recovery. Their ancestor parted with the whole property forever, and unless some new rule of interpretation be invented by the fruitful imagination of the counsel, the purchasers must be deemed to have acquired, in full separate property, the lots themselves, and a common property in the out-lands.

It is also a rule of interpretation that, obscure or doubtful expressions used by the author of an act, are to be explained according to his probable intention, which is to be sought in the language, the circumstances and the relation of the parties. Such doubtful expressions should be so interpreted as to depart the least possible from the nature of the contract, and against him who invokes or claims a right contrary to the nature of the contract, when he ought to have explained himself more clearly. "Contra eum qui clarius loqui potuisset, et debuisset."

The prospectus emanated from Wiltz alone; it was his sole work. If there be expressions in it which leave the least doubt as to his intention, the construction should be against him and his heirs. They now pretend that he gave

ARNAULD
v.
DELACHAISE.

to the purchasers of the forty-two lots only a limited or restricted right in the mere use of the out-lands, and that during a limited period, which period they say has expired. If that had been the intention of *Wiltz*, he might easily have used expressions which would clearly have conveyed that idea. He might have said he reserved some reversion to himself or his heirs—he might have suppressed the expressions *à perpétuité*, and made it expressly a limited interest or use. How could the purchaser of a particular lot imagine, from the terms of the prospectus, that he was acquiring a mere right to use for a limited period of time, those out-lands which *Wiltz* declared he abandoned in perpetuity? That a right which, whatever it may be, to or in the lands, was expressly declared perpetual and common to the purchasers, was intended by him to be limited to the lifetime of the purchaser? Agreements are to be construed, according to the doctrine of Paley, in such a way as the promissor had a right to suppose, from the language used, that his promise was understood by the other party.

But, it is contended on the part of the plaintiffs, if I understand the argument, that the purchasers of the lots were not invested with the *dominium* in the out-lands, because the *jus disponendi* did not pass by the abandonment. To that I answer, that although the *jus disponendi* is of the essence of full and perfect property, yet it does not follow that every contract by which the property in things is transferred should contain an express declaration to that effect. If A sells a slave to B, for a price, although nothing may be said as to the right of B to enjoy the fruits of his labor, and to dispose of him at his discretion, yet B acquires such full property by legal inference, and as the effect of the contract itself. "Une propriété," says Pothier, "est pleine et parfaite, lorsqu'élle est perpétuelle, et que la chose n'est pas chargée de droits réels, envers d'autres personnes que le propriétaire. Au contraire elle est imparfaite, lorsqu'elle doit se résoudre au bout d'un certain temps, et par l'évenement d'une certaine condition.

Le droit de propriété considéré par rapport à ses effets, doit se définir le droit de disposer à son gré d'une chose, sans donner neanmoins atteinte au droit d'autrui ni aux lois—jus de re liberé disponendi, vel jus utendi et abutendi." Dom. de Prop. 4, 8 *et seq.*

To construe the words, "pour par eux en jouir en commun" so as to restrict the interest conveyed to a mere temporary use of the thing, is either a begging of the question or a violation of every rule of construction. It supposes, that the absolute abandonment forever to the purchasers, is to be qualified by an expression as to the manner in which the property is to be enjoyed by them, to wit, in common and perpetually.

Nor can the expressions justify the pretence, that these out-lands became a *commune* in any legal sense of the word. On the contrary, they are to be enjoyed by the purchasers not by the public. All these authorities which have been referred to in relation to the division of *communes* have no application to the present case. The property is destined to the exclusive perpetual use of the purchasers, and even the grantor reserves no right whatever to or in them.

Every usufruct or use is essentially limited in time, because the very constitution of it is a dismemberment of property. It is limited either by the act or contract by which it is created, or by law. In relation to legal usufructs, such as the father's in the separate property of his children, the law itself, which establishes them, limits their duration. An usufruct in favor of a corporation, though unlimited by the terms of the grant, is restricted to thirty years by the existing law. An usufruct given in terms to an individual, if not otherwise limited, would terminate with his life. But it cannot be pretended that the forty-two individuals, who separately and at different periods purchased parts of this tract of land, and whose number by various sales, transfers and arrangements had been reduced to seven or eight at the time the partition took place, ever constituted a corporation or a community. They never composed when united together, one moral person. No voluntary connexion in interest of any number of individuals, without any sanction by law, can be treated as a corporation or community. A grant to them therefore must be regarded as a grant to individuals and not to a corporation; and consequently the legal restriction to a term of years does not apply. And indeed, how could the law in such a case be invoked to get rid of that fatal stumbling block in the way of the plain-

tiffs, resulting from the express declaration that the abandonment is made to the purchasers, separately and individually in perpetuity ?

In conclusion, I will simply say, that the manner in which the parties themselves carried out this contract, shows what their common interpretation of it was, at the time. *Wiltz* never required any security from the purchasers to insure their administration of the property, as bound by law, a right which he unquestionably had, if this be an usufruct or use. Such security is of the nature of the contract, though not of its essence, and may in all cases be required, when not expressly dispensed with by the contract by which the usufruct is constituted or by law. On the contrary, neither he nor his heirs ever interfered for nearly forty years. In the meantime various separate sales had taken place, reiterating the same conditions and terms.

*Jourdan*, for the town of Freeport, intervenors, appellants.

The judgment of the court (*Rost*, J. absent,) was pronounced by

EUSTIS, C. J. In the year 1807, the late *Joseph Wiltz*, the ancestor of the plaintiffs, laid out a part of his plantation in the present parish of Jefferson, into lots, and sold them to different persons according to a plan. The tract of land thus disposed of was four arpents front on the river, by forty in depth. The plan exhibits an avenue in the middle of the tract of one hundred and ten feet, and a row of lots on each side fronting on the avenue, making forty-two in number. Between the lots nearest to the river and the road a space was left undivided and vacant, as well as the batture in front; the remainder of the tract beyond the forty-two lots in the rear was in the same condition. There is written on the plan a prospectus, as it is called, which we thus translate :

" Quartier de Plaisance : Plan of the plantation of *Mr. Joseph Wiltz*, two and a half miles above the city, divided into lots sufficiently spacious to establish country houses, taverns, gardens, etc.

" *Note :* The lots numbered and colored in red are the only ones for sale at present. New Orleans, 22d June, 1807. Drawn by H. Laclotte, architect.

(Signed)     J. WILTZ."

### " *Prospectus.*

" The portion of the front, of the batture, of the pasture and of the cypress swamp, corresponding with the forty-two lots offered for sale at this time, and in conformity with the titles of the vendor, is abandoned in perpetuity in favor of the purchasers, to be by them enjoyed in common, with this sole condition, that the said purchasers shall not send in the common pasture but three head of animals for each lot, and shall cut wood in the swamp for their private use only and not for sale." Provision is then made that the trees in the avenues shall be planted, and the ditches and roads shall be made by the purchasers.

The whole of the forty-two lots were sold to different persons in accordance with this plan, and under the conditions of this prospectus. In January, 1838, the proprietors made a partition of the front, the batture, and the rear of the tract, which they held under their several purchases of lots. The present suit is brought by the plaintiffs, the heirs of the original vendor, against the defendant, who holds under the sales made in conformity with the plan and prospectus, to recover those portions of the original tract, on the ground that the right of property was not transferred by their ancestor by the sales of 1807, but a right of use only, and that the right of use has terminated by reason of the acts of the defendant. In the District court the plaintiffs recovered judgment for all that portion of the tract to which the district judge held the right of use only to extend, to wit: the batture, the space left in front, and the land in the rear of the forty-two lots. From this judgment the defendant has appealed.

The first question to be determined, and upon which all the others presented

ARNAULD
v.
DELACHAISE.

in argument depend, is the title acquired by the original purchasers of the lots laid out and sold by the plaintiffs' ancestor.

It is conceded that the defendant is the owner of some twenty-two of the forty-two lots, which she holds by divers conveyances under the original title from *Joseph Wiltz*, given under the plan and prospectus before mentioned ; and that the plaintiffs are not at present owners of any portion of the forty-two lots, and were not at the time of the partition spoken of in 1838. The position of the defendant is, that the plaintiffs have no right, title, nor interest in the land sued for, to wit : the front, the batture, the pasture land and the cypress swamp, the same having been sold by the plaintiffs' ancestor with the forty-two lots, the whole forming the plantation divided into the Quartier de Plaisance.

If we consider the language made use of by the vendor in disposing of this property, it certainly has the appearance of doing violence to its obvious sense, to insist that he intended to reserve, or did reserve, any title or interest adversely to the purchasers. Terms more absolute, definite, or comprehensive, could scarcely be used to indicate a complete divestiture of all right in the property on his part. *He abandons in perpetuity*, in favor of the purchasers, the land in front and in the rear of the lots. The term abandonment excludes any reservation as to the title, as positively as the term perpetuity excludes any limitation of time. Indeed, the terms used appear to express fully the obligation of the vendor under the roman law—præstare emptori rem habere licere.

But it is contended by the counsel for the plaintiffs that the condition, that the purchasers of the lots shall only be allowed to send to the common pasture three head of animals, and to cut wood for their own private wants, creates an use merely in the purchasers, and that the only interest conveyed to them was the right of use or at most a right of usufruct. The most formidable objection to this construction is that presented by the contract itself, which is strengthened by the sense which both parties have acted upon up to the time of the institution of this suit.

In ascertaining the meaning of the terms used, and whether an usufruct only has been created by them, the diligence of counsel has brought to our aid the opinions of several authors who have treated the subject of usufruct in the language in which the contract under consideration is written.

Proudhon considers that perpetuity is contrary to the very essence of usufruct, and if the entire enjoyment of an estate has been expressly bequeathed in perpetuity to a community, the right bequeathed would have only the name of usufruct, and the property itself would pass by the description. He lays it down as a rule that, when in a testamentary disposition the gift is expressly intended to be perpetual, it does not create a mere right of usufruct, but conveys the ownership itself. The usufruct being essentially temporary, it is necessarily excluded by the perpetuity which the testator has established. It appears that the usufruct only is conveyed in cases in which the separation of the right of enjoyment from the right of ownership is clearly expressed in the act. In this view the authors who have written on the subject hold, according to the texts of the roman law, that the legacy of a house to inhabit it, that of an estate to enjoy it, that of a domain in order that the legatee may have wherewith to live, comprehends also the entire property of the house, the estate, and the domain, because it is one thing to express the motive or the cause of the bequest, and another to bequeath only the simple right of enjoyment. Proudhon, Traité d'Usufruit, *loc. cit.*

We think the opinions of this author on this subject are in accordance with

ARNAULD
v.
DELACHAISE.

others of authority cited by the counsel for the defendants. In the case of *Pontalba* v. *The Municipality*, recently decided by this court (3 An. p. 660), we held the property itself to pass to the donee under a donation, the effect of which was far less clear as to its vesting the property than the sale under consideration appears to us to be. Under this interpretation we cannot say that *Wiltz* retained the property in dispute, and conveyed merely the usufruct of it to the purchasers of the lots. If, in a testament or donation, the terms made use of would transfer the property, we see no reason why they should not be held to the same meaning in the contract of sale, where every thing embraced in it formed a constituent part of the price.

But if no usufruct was created, it is urged by the counsel for the plaintiffs that the purchasers of lots acquired in the batture, front, pasture ground and cypress swamp, no other right than a right of use.

The abandonment in perpetuity of these objects, as we have seen, was made in favor of the purchasers of the lots to be by them enjoyed in common, with this sole condition, that the purchasers shall not send into the common pasture ground more than three head of animals for each lot, and they have only the right to cut wood in the cypress swamp for their own use and not for sale.

It seems to us that the question presented by this position of counsel is already determined by the conclusion which we have adopted, that the right of property was not reserved to *Wiltz*, but passed, by the sale, to the purchasers of the lots. This right of use was confined to the pasture ground and the cypress swamp, and did not extend in its terms beyond them. The condition evidently was intended to regulate the use of them among the purchasers, and purported nothing else. It was a regulation considered advantageous in order to enable each one to use the common property without detriment to it, or annoyance to each other. There is nothing unusual in it, nor does it conflict with any of the avowed objects of the sale, but is in furtherance of them all.

If there were any doubt concerning the extent and meaning of the terms made use of in this contract, the law would oblige us to construe them against the seller. The vendor is bound to explain himself clearly as to the extent of his obligations, and an obscure or an ambiguous clause must be interpreted against him. C. C. 2449.

We think the plaintiffs are without any right, title, or interest in the land which is the subject of the present suit.

The corporation of the borough of Freeport, within which the land in dispute is situated, has appealed from the judgment of the District Court in favor of the plaintiffs, and has appeared by counsel, who has presented an argument in writing in behalf of said corporation. The corporation claims the property in dispute as public, on the ground of its having been dedicated to public use by the prospectus, plan, and sales aforesaid, all of which were recorded in the office of a notary public.

The evidence in this case does not establish a dedication of this kind to public use, and the corporation of Freeport has no interest whatever in this suit. Neither party has moved to dismiss this appeal; the party is before the court, but has adduced nothing which affects the rights of the defendant.

The judgment of the District Court is, therefore, reversed, and judgment rendered for the defendant, with costs in both courts.